## Holliday v. Fields, Governor.

(Decided July 14, 1925.)

Appeal from Executive Order.

1. Officers—Charges by Governor Must Each be Supported by Affidavit of Two Witnesses to Warrant Removal from Office.—In proceeding by Governor under Constitution, section 227, as amended,

and Acts 1924, chapter 49, for removal of officers of Commonwealth for neglect of duty or malfeasance or misfeasance in office, each charge made must be supported by affidavit of two persons.

2. Officers—Act Authorizing Removal of Officers by Governor Held Not Retrospective.—Amendment of 1918 to Constitution, section 227, not being self-executing, Acts 1924, chapter 48, effective June 18, 1924, which provided for removal for neglect of duty, even though not willful, not containing any express declaration that it should apply to past offenses, held to be prospective in effect and not retrospective, in view of rule of construction of legislature's intent under Kentucky Statutes, section 459.

3. Officers—Charges by Governor for Removal of Officers Must be Legally Sufficient, and Notice and Opportunity to Develop Facts Must be Afforded.—Although under Constitution, section 227, as amended, and Acts 1924, chapter 49, charges by Governor for removal of officers for neglect of duty, misfeasance, and nonfeasance in office need not possess formalities and exactness of indictment, they must be legally sufficient, and proper notice and opportunity afforded to develop facts, which must support order of removal.

4. Officers—Errors of Law or Fact by Governor in Removing an Officer Reviewable on Appeal.—In proceeding by Governor under Constitution, section 227, and Acts 1924, chapter 49, for removal of officers for neglect of duty or misfeasance or nonfeasance, Governor exercises discretion, and on appeal by officer court may review any errors of law or fact, and finally determine matter on its merits.

5. Officers—"Neglect of Duty" Within Meaning of Amendment Authorizing Removal from Office Therefor Defined—"Misfeasance"— "Malfeasance."—"Neglect of duty," within meaning of amendment of 1918 of Constitution, section 227, for removal of officers therefor, means careless or intentional failure to exercise due diligence in performance of official duty, degree of care depending on character of duty, and including therefor willful neglect, and such forms of misfeasance and malfeasance as involve a failure in performance of duties required by law; "misfeasance" being the wrongdoing of an official act, and "malfeasance" being wrongdoing of official act with evil intent, accompanied by such gross negligence as to be equivalent to fraud.

6. Officers—Intent of Constitutional Amendment to Section Providing for Removal of Officers Stated.—Amendment of 1918 to Constitution, section 227, making neglect of duty a cause for removal of officers, held not intended to create an additional offense, or appoint censor of public morals for public officials, but rather to have intended better law enforcement and more diligence and greater efficiency on the part of peace officers by authorizing removal of such as did not do their duty.

7. Sheriffs and Constables—"Neglect of Duty" of Peace Officer as Cause for Removal Illustrated.—It would be neglect of duty within meaning of Constitution, section 227, as amended, to carelessly or intentionally suffer a criminal to escape or prisoner to be lynched,

or fail to arrest person committing public offense in his presence, or fail to perform any duty required by law, intentionally or by reason of drunkenness, use of narcotics, mere indolence, or other cause, but personal acts of officer violating law, or single act of intoxication, not accompanied with failure to discharge duties of office, is not within terms of amendment.

8.  Criminal Law—Legislature in Carrying out Constitutional Amendment Cannot Enlarge or Extend Terms of that Instrument by Defining its Words or Adding Offenses.—While the legislature may designate offenses within the meaning of the constitutional words of an amendment, it cannot enlarge or extend terms of that instrument by defining its words or by adding offenses not included therein, and statute must be read in light of power conferred.

9.  Sheriffs and Constables—Statute Enforcing Amendment Providing for Removal of Peace Officers for Neglect of Duty Held to Have Exceeded its Power.—Where Constitution, section 227, as amended, provided for removal of peace officers for neglect of duty only, Acts 1924, chapter 49, thereunder denouncing offenses and attempting to include, as neglect of duty, malfeasance and misfeasance, such as bribery and gross immorality, held to have exceeded power conferred, as offenses named, though violations of law, are not synonymous with "neglect of duty."

10.  Sheriffs and Constables—Misconduct and Intoxication of Sheriff. Held Not Basis for Removal Under Constitutional Amendment.— In proceeding for removal of sheriff under Constitution, section 227, as amended, and Acts 1924, chapter 49, charge showing that he was drunk, violent, boisterous and indecent to amount to gross misconduct, and subject him to liability of heavy fines, which might be basis for prosecution for malfeasance in office before jury, held not sufficient to show neglect of duty in office, authorizing removal by executive order.

11.  Sheriffs and Constables—Evidence Not Sufficient to Warrant Removal of Sheriff from Office for Neglect of Duty.—In proceeding for removal of sheriff from office under Constitution, section 227, as amended, and Acts 1924, chapter 49, evidence which could be considered on charges supported by sufficient affidavits held insufficient to show neglect of duty in office after amendment became effective June 18, 1924, although all the evidence on charges not supported by proper affidavits may have been sufficient.

MOORE & MOORE, MORGAN, EVERSOLE & BOWLING and JOHN D. CARROLL for appellant.

FRANK E. DAUGHERTY, Attorney General, GARDNER K. BYERS, Assistant Attorney General, OVERTON S. HOGAN, DENNY P. SMITH and BAILEY P. WOOTTON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

This is an appeal from an executive order entered by Hon. Wm. J. Fields, Governor of Kentucky, on the

5th day of March, 1925, removing Tolbert Holliday from the office of sheriff of Perry county.

The proceedings were held pursuant to the provisions of section 227 of the state Constitution and the provisions of chapter 49 of the Acts of the General Assembly of 1924, which become effective June 18, 1924, and were based on eleven charges preferred by the Governor and reading as follows: .

"(1)    Drunkenness on or about August 26th and 27th, 1924, in the town of Hazard, Perry county, Kentucky.

"(2)    Again with drunkenness on or about the middle of December, 1924, in the town of Hazard, Perry county, Kentucky.

"(3)    With using loud and boisterous language and cursing upon the streets in the town of Hazard, Perry county, Kentucky, the same dates heretofore stated.

"(4)    That during the month of April, 1924, the said Tolbert Holliday was present at and saw a game of cards, where money was bet, won and lost, and that he failed to make any arrest of any person engaged in or conducting said game and thereby failed to perform his duty as a peace officer or to enforce the law, which it was his duty to do.

"(5)    That during the month of April, 1924, the said Tolbert Holliday engaged in a game of cards in which money was bet, won and lost, and that said game was conducted on the second floor of the Mazer building on Main street in the city of Hazard, Perry county, Kentucky, and that said sheriff was thereby guilty of committing a crime under the laws of the state of Kentucky.

"(6)    That on the night of January 30th, 1925, in the city of Hazard, Perry county, Kentucky, the said Tolbert Holliday entered the Club pool room and restaurant in said city and county and state of Kentucky, and, without any apparent reason therefor, used violent and vulgar language and disturbed the public peace of said city by his conduct in said business house; that he was in a state of intoxication and used violence upon the persons there congregated by throwing men and boys outside said building and by striking one person over the head with his pistol and throwing him out of the house; that on

said occasion and immediately following, he used vulgar, indecent and improper language, and further committed the offense of swearing on the public streets of the city of Hazard, Perry county, Kentucky, and in the presence of citizens generally and ladies especially, and all of said conduct was engaged in by said Holliday at a time when all persons congregated in said pool room and restaurant were peaceful and quiet and no disturbance existed at said time, and at a time when no person who was abused or attacked was resisting the officer or committing any felony whatever.

"(7) That in the month of May, 1924, the said Tolbert Holliday in a room in the Beaumont Hotel in Hazard, Perry county, Kentucky, where John Bailey was conducting a game of cards, wherein money was being bet, won and lost, and that said Bailey was operating said game, and that the same was done in the presence of said Tolbert Holliday; that whiskey was upon the table and that said Holliday did not arrest, or cause to be arrested, the person conducting the game or the owner of the whiskey, or the persons engaged in the game, and thereby failed to perform the duties of his office or to enforce the laws.

"(8) That upon the above occasion the said Tolbert Holliday engaged in the game above described, wherein money was bet, won and lost at the place and time above stated, and thereby committed a crime of gambling and violation of the laws of this state.

"(9) That prior to July, 1924, one Justus Begley held the office of deputy sheriff of Perry county under said Tolbert Holliday, sheriff of said county, in the state of Kentucky, and that the said Tolbert Holliday caused the said sheriff to operate in the camp of the Columbus Mining Company; that the said Justus Begley received for his services at said Columbus Mining Company the sum of $150.00 per month, less $9.85 for house rent per month; that the said mining company paid the the sheriff, Tolbert Holliday, the sum of $175.00 per month for the said Justus Begley's services, and that the said Holliday paid to Begley $150.00 per month, and thereby kept and retained for his own use and benefit, and did use the sum of $25.00 per month out of the compensation for said services of said Justus Begley.

"(10)   That John M. Combs is and has been deputy sheriff of Perry county, Kentucky, under the sheriff of said county, Tolbert Holliday, and that the said Combs was assigned to and performed work and services in the camp of the Hazard-Jellico Coal Company at Harveytown, Perry county, Kentucky; that said Tolbert Holliday, sheriff of said county, paid to the said Combs for his services the sum of $150.00 per month; that prior to the election of said Tolbert Holliday as sheriff aforesaid the said coal company paid to the said Combs the sum of $175.00 for the same services rendered in the same capacity as deputy sheriff of Perry county; that after the election and qualification of said Tolbert Holliday, the salary of said Combs was reduced $25.00 per month, and the said $25.00 was to be paid and was paid, to the said Tolbert Holliday, sheriff of Perry county.

"(11)   By his failure, as sheriff of Perry county to execute and serve process placed in his hands from Letcher and other counties of the Commonwealth, and by his failure to serve process in litigation pending in the Letcher, Perry and other courts of the Commonwealth."

Due notice was given appellant of the time and place of the hearing and he appeared and successively filed numerous demurrers and motions, each of these being filed without waiving those preceding it, and as to all of which the executive reserved his ruling.   These included special demurrers to the jurisdiction of the Governor to hold the proceedings and to each charge, also general demurrers and motion to strike each charge severally and motion to elect upon which of the charges the Commonwealth would rely.

Respondent was inducted into office in January, 1922, and proof was taken upon the part of the Commonwealth covering the entire period of his incumbency, much of it relating to matters not embraced in the written charges.   Also each of a number of the charges preferred was supported by the affidavit of but a single person.   At the close of the Commonwealth's evidence appellant moved to exclude all evidence as to matters occurring before the effective date of the act, June 18th, 1924.   This was overruled and defendant declined to introduce any evidence, although afforded ample opportunity to do so. Pending the trial appellant sought a writ of prohibition

in this court on the ground that the act vested the Governor with judicial power and in effect created a new court in violation of the Constitution. The writ was denied and the validity of the act in that respect upheld. Holliday v. Fields, Governor, 207 Ky. 462. The questions to be determined may be summarized thus: (1) Does the act require each charge made by the Governor to be supported by the affidavit of two persons, or may several charges be combined, each supported by the affidavit of a single person? (2) Is the act prospective or retrospective? (3) Are the acts charged sufficient in law and supported by sufficient evidence to authorize appellant's removal?

In view of the voluminous record, it is thought best to consider the legal questions involved before referring to the facts or discussing the charges in detail.

Section 227 of the Constitution is in these words:

"Judges of the county court, justices of the peace, sheriffs, coroners, surveyors, jailers, assessors, county attorneys and constables shall be subject to indictment or prosecution for misfeasance or malfeasance in office, or willful neglect in discharge of official duties, in such mode as may be prescribed by law; and upon conviction his office shall become vacant, but such officer shall have the right to appeal to the Court of Appeals. Provided also, *that the General Assembly may, in addition to the indictment or prosecution above provided, by general law provide other manner, method or mode for the vacation of office or the removal from office of any sheriff, jailer, constable or peace officer, for neglect of duty, and may provide the method,* manner, or mode of reinstatement of such officers." (Our italics).

The part in plain type embodies the original section which appeared in substantially the same language in the third Constitution, and the italicized part is an amendment thereto by an act of the legislature approved in March, 1918, and ratified by the people at the general election in 1919.

The act is entitled an act relating to the suspension and removal of officers in this Commonwealth by the Governor of the state for neglect of duty, or for malfeasance or misfeasance in office.

The first section reads in part:

That if any sheriff, jailer, constable or peace officer of this Commonwealth is guilty of gross misconduct in office, bribery, gross neglect to enforce the laws of this Commonwealth, gross immorality or habitual drunkenness, he shall be deemed guilty of neglect of official duty and shall be removed from office by the Governor. The proceeding for the removal of any officer from office under provisions of this act shall be based upon written charges signed by the Governor setting forth the grounds for removal of the officer sought to be removed, and said charges must be supported by the affidavit of at least two witnesses, and which affidavits must be filed by the Governor as a part of the record in the proceedings. . . . ''

The second section provides for an appeal to the Court of Appeals. The third for filling a vacancy in case of removal, the fourth disqualifies an officer so removed from holding office in this Commonwealth for a period of four years, and the fifth provides that such removal shall not be a bar to a criminal prosecution for misfeasance, malfeasance or neglect of official duties.

It will be observed that the constitutional amendment relates alone to ''neglect of duty'' upon the part of peace officers. The original section (227) provided for the removal of an officer upon conviction for malfeasance, misfeasance or willful neglect of official duties ''in such mode as may be prescribed by law.'' Other constitutional provisions provided for a motion upon the officer being convicted of a felony or any high misdemeanor; but aside from section 124, relating to clerks, all of these contemplate the ''wrongdoing'' of an official act or an intentional failure in the discharge of official duty, and require impeachment or conviction in a criminal trial.

Criminal trials may be influenced by local conditions, and it is sometimes difficult to indict or convict an influential officer. Also the words ''in such mode as may be prescribed by law'' as used in that section are construed to mean the character of official duties prescribed by law and not to apply to the form of procedure. McBride v. Comth., 4 Bush 331, and as the latter is prescribed by the Constitution it may not be changed by the legislature. Peace officers are charged with the maintenance of public peace, the arrest of law breakers and '

the safekeeping of prisoners; mere neglect of duty upon their part encourages lawlessness, affords an opportunity of escape to criminals and may lead to mob violence and lynching. Indeed there has been much complaint as to these matters and this amendment was adopted to secure more diligent service upon the part of such officials by providing an additional cause for removal and a new form of procedure therefor. On the other hand, an efficient peace officer leads a hazardous life and if bold and vigilant makes enemies who hope for his downfall, lend willing aid to its accomplishment and who, if afforded an opportunity, may harass an officer and consume the time of the highest state officials in such investigations upon insufficient or unsupported charges. Clearly such was not the purpose of the amendment which, together with the entire section, should be construed according to its plain intendment and in the light of former opinions of this court construing the original section and others of like import.

(1) Considering the first question in this light, the words, "the said charges must be supported by the affidavits of at least two witnesses," are mandatory, and jurisdiction to hear the charges is dependent upon the condition thus imposed. If only one charge is preferred it necessarily must be supported by the affidavit of two persons. If there are several charges, each charge is a distinct count that if standing alone could be relied on as a basis for the proceeding. If it requires two witnesses to a single charge, it necessarily requires two witnesses to each of several distinct charges, and a single witness to each of a number of charges does not meet this requirement, as neither is strengthened by the extraneous matters appearing in the other. For the same reason the fact that some of the charges are properly supported does not validate additional unsupported charges or additional charges supported by a single witness.

(2) As suggested above, most of the charges and the greater part of the evidence as well as the principal findings of the Governor relate to events occurring before the effective date of the act, and the probative value of all of these depends upon whether the act is to be given a prospective or retrospective effect, and as it was enacted to make the amendment effective it is necessary to construe both.

Under the original constitutional provision an officer might be removed only for misfeasance or malfeasance

or willful neglect of duty. By the amendment he may be removed for neglect of duty, though not willful. It is obvious, therefore, that not only a new mode but also a new ground of removal is provided, and that the new procedure is limited to this ground. The amendment is not self-executing but by its terms legislation is required to make it operative. The legislature was given discretion in the matter, it might or might not have enacted such statute, but unless and until it did act the provision was inoperative and no proceeding could be instituted thereunder. Necessarily such a provision is only applicable to future acts; for if the act or omission was not grounds for removal when done, it could not be given a greater effect by the subsequent act of the legislature. Nor does the statute undertake this. As is usual in such statutes no direct reference is made to future acts or omissions, but there is no express declaration that it shall apply to the past offenses and there is nothing in the words used that indicates a legislative intent that it shall do so, and under the general rule of construction it must be given a prospective effect. Section 459, Ky. Stats.; L. & N. R. v. Sharp, 91 Ky. 411; Watts v. Com., 78 Ky. 329; Long v. City of Louisville, 97 Ky. 364; Cooley on Limitations, section 370; Story's Const., section 1392; 1st Kent's Com. 455; 36 Cyc. 1205; R. C. L. Subject Stats., section 35; Schwab v. Doyle, 258 U. S. 529; Eidmen v. Martinez, 184 U. S. 578; White v. U. S., 191 U. S. 545; Gould v. Gould, 245 U. S. 151; Fullerton-Kruger Lumber Co. v. Northern Pacific Ry. Co., 69 Lawyers' Ed. 189.

(3) As to the sufficiency of the charges and of the evidence to support them, it was held in Holliday v. Fields, *supra,* that in these proceedings the Governor acts in an administrative capacity. Such inquiries are not required to be conducted under the forms of court procedure, and the charges are not required to possess the formalities and exactness of an indictment. It is necessary, however, that they be legally sufficient; that proper notice be given and that an opportunity be afforded for a development of the facts and that the order of removal be supported by legal evidence. In passing on these matters the Governor exercises discretion, and as to them on an appeal by the officer this court may review any error of law or fact and finally determine the matter on its merits. In this they are distinguished by injunctive relief against administrative boards whose decision is final; though even in these cases the court may inquire into the

legal sufficiency of the charges and determine whether there is any evidence to support them. Reese v. Hickman County, 187 Ky. 641; Stanley v. Fiscal Court Hopkins County, 190 Ky. 498; Henderson v. Layne, 202 Ky. 610; Graham v. Jewell, 204 Ky. 260.

To be legally sufficient the charge must specify some fact constituting neglect of duty within the meaning of the amendment. The original section was self-executing, and neither the causes for removal nor the procedure therein provided could be changed by legislative enactment. Lowe v. Com., 3 Met. 237; Grover v. Com., 6 Bush 1. A new procedure for such causes of removal might have been authorized by the amendment, but this was not done. While forming an integral part of the section, all of which must be construed together, the amendment is an addendum. The original section is left intact; as to it the denounced offenses, the fixed penalties and the form of procedure remain unchanged, and it is evident that the legislature was only authorized to provide a procedure for the new cause of removal, that is, for "neglect of duty;" and the extent of the inquiries that may be instituted by the Governor depends largely upon the meaning to be given these words. Obviously they refer to neglect of official duties, and do not apply to personal acts unconnected with the duties of the office. Com. v. Barry, Hardin 238; Com. v. Chambers, 1 J. J. M. 160; Com. v. Williams, 79 Ky. 42. It is argued, however, that the offense of either "misfeasance" or "malfeasance" in office constitutes "neglect of duty" and that for such offenses the officer may be prosecuted by indictment under the original section, or removal by the Governor for "neglect of duty" under the legislative act authorized by the amendment; this at the option of the Commonwealth. There is force in this argument, but we do not think it applicable to these provisions. True, the word "neglect" may signify "a failure to forbear" in the performance of duty, and in this broad sense the term "neglect of duty" may embrace every failure to properly discharge an official duty and therefore to include the offenses named, but this does not necessarily follow. For on the contrary, the word "neglect" is most frequently used in the sense of a failure to do or to act, and especially is this true when it is used in connection with other words implying action, and in this respect the words "misfeasance" and "malfeasance" have long since acquired a special significance; thus, "Misfeasance in of-

fice is the wrongdoing of an official act." Com. v. Williams, *supra*. "Misfeasance in office is the wrongdoing of an official act with an evil intent, or accompanied by such gross negligence as to be equivalent to fraud." Com. v. Wood, 116 Ky. 750. As defined in Webster's New International Dic. "Malfeasance" is the doing of an act which a person ought not to do; evil conduct; an illegal deed." "Misfeasance is a trespass." (Law) A wrong done; the doing wrongfully and injuriously of an act, which a person might do in a lawful manner; the wrongful and injurious exercise of lawful authority."

It thus appears that at the time of the adoption of the amendment these terms, whether used in a legal or a popular sense, signified a trespass or wrongful act in the performance of official duty, or such gross neglect as was equivalent to fraud. Evidently the legislature and the people understood this. Clearly they did not intend for the new procedure to apply specifically to the offenses denounced in the original section. It is equally clear that by the retention of the original section unchanged that they intended for each term used in the entire section as amended to be given some force and effect. This cannot be done if those offenses are included within the meaning of the words "neglect of duty" and can only be done by distinguishing the latter words and giving to them the popular meaning of an omission or failure to perform official duties. Indeed this interpretation is in line with the desire and purpose of the people. There was no complaint of overt misconduct upon the part of public officials going unpunished, and in this respect no distinction is drawn between peace officers and other officials. But there was serious criticism of the laxness of law enforcement and of the prevalence of the crime of lynching, and the amendment was enacted and adopted in obedience to a popudar demand for the correction of these abuses. In this the people were not seeking additional punishment for crimes and misdemeanors, even though they involved misfeasance and malfeasance. For all such offenses they seemed to think existing laws afforded adequate punishment. Nor did they seek the appointment of a censor of morals for public officials, but they did desire better law enforcement, better protection for prisoners and more diligence and greater efficiency upon the part of peace officers, and to secure this end they authorized the removal of such of these officers as did not do their

duty, with the expectation that this would spur them to action. Such is the effect and intent of the amendment. Thus construed, the words "neglect of duty" as used therein may be defined as a careless or intentional failure to exercise due diligence in the performance of official duty; the degree of care to be exercised depending upon the character of the duty to be performed. This will include willful neglect and such forms of misfeasance or malfeasance as involve a failure in the performance of duties required by law.

To illustrate: It would be neglect of duty for a peace officer carelessly or intentionally to suffer a criminal to escape or a prisoner to be lynched, or to fail to arrest a person who committed a public offense in his presence, or intentionally or by reason of drunkenness, the use of narcotics, mere indolence or other cause, voluntarily fail to perform any of the duties required of him by law, and for such a failure in a proper case he might be removed, but personal acts constituting a violation of law or a single act of intoxication not accompanied with a failure to discharge the duties of the office, is not within the terms of the amendment.

As by the constitutional amendment the legislature is only authorized to provide for the removal of the officers named for neglect of duty, the statute must be read in the light of the power conferred. It appears from the title and the nature of the offense denounced in the act that the legislature attempted to include "malfeasance" and "misfeasance" as constituting neglect of official duty. To some extent it thus exceeded its power. While the legislature may designate offenses within the meaning of the constitutional words it is well settled that it cannot enlarge or extend the terms of that instrument by defining its words or by adding offenses not included therein. Com. v. Williams, 79 Ky. 42; Brown v. Grover, 6 Bush 1; Lowe v. Com., 3 Met. 237. The offenses for which the Governor may remove an officer under the act are, "gross misconduct in office," "bribery," "gross neglect to enforce the laws of this Commonwealth," "gross immorality" and "habitual drunkenness." Bribery is a violation of law and gross immorality may be, but neither is synonymous with neglect of duty, as an officer may be guilty of such offenses and yet otherwise discharge all the duties of his office. However, it can not be doubted that if he accepted a bribe to neglect official duty, that this would accentuate the neglect, and

might be joined with a charge of "neglect of duty." And so as to certain acts of immorality; but standing alone each of these offenses would state a personal act only. So as to "gross misconduct in office," which may or may not involve a "neglect of duty," depending upon the facts charged.

"Habitual drunkenness" in office can scarcely exist, without neglect of some of the duties of the office, and the charge of "neglect to enforce the laws of the Commonwealth" is also clearly within the terms of the amendment, but as "neglect of duty" refers only to official delinquency, the words, "in office," must be applied to all of the charges specified in the act.

Applying the above principles to the concrete questions involved, it appears that charges 4, 5, 7, and 8 should not have been considered, first, because each of them was supported by the affidavit of a single person, second because each of them related to events occurring before the effective date of the act.

Each of charges 9 and 10 is supported by the affidavit of a single witness only and both should be disregarded.

Charge 11 is indefinite as to date, is supported by the affidavit of but one person and is otherwise unsupported by the evidence.

Charge 1 is sufficient as to date and affidavits, but charges a single act of drunkenness. Charge 2 is within the date of the act, but it is supported by the affidavit of only a single witness, and charges a single act of drunkenness. Charge 3 is sufficient as to date and affidavits. It accuses the appellant of cursing and using boisterous language on the occasions set out in charges 1 and 2. However, there is no allegation in any one of these charges of a failure to discharge an official duty, and, as we have seen, mere personal misconduct is not alone sufficient to authorize the removal of an officer for neglect of duty, and under the statute a single act of drunkenness is insufficient.

Charge 6 relates to matters occurring after the effective date of the act and is properly supported by affidavits. The evidence tends to show that on the night, of January 30, 1925, a fight occurred in a pool room in the city of Hazard. Appellant and one of his deputies went to the pool room. When they arrived the fighting had ceased but the participants were threatening to renew it. Holliday, who was in an intoxicated condi-

tion, dispersed the crowd by ejecting everyone from the pool room. He did this in a rough and violent manner, shoving, pushing and peremptorily ordering them out, hitting several with his pistol, kicking at one and striking a crippled boy over the head with his pistol, producing an ugly wound. The boy at the time was a spectator sitting on a stool and taking no part in the difficulty. After the crowd was dispersed Holliday went out upon the street and engaged in a controversy with one Begley, a policeman, in which he cursed the entire police force and roundly abused and offered to fight Begley, who had formerly been a deputy sheriff under Holliday and who had been discharged and later employed as a policeman, this boisterous and indecent conduct being continued until friends persuaded Holliday to desist. Hazard is a mining town. Its population has increased from 500 in 1912 to over 8,000 at present. Of these 2,500 work in five different mines located near the city limits, and are composed of various nationalities, speaking five different languages, many of whom have no knowledge of English. No doubt the ethical standards that prevail in the older and more settled communities are absent. It is also quite likely that violent and turbulent characters abound and a fight in a pool room in such a town is a matter of serious consequence, and some allowance may be made for hasty action on such an occasion. But appellant's intoxication and conduct on this occasion were reprehensible, and, while not so stated in the charge, may be denominated as "gross misconduct." He may be heavily fined both for the assault on the boy and for the breach of peace in the Begley episode. He is also subject to a heavy fine for being intoxicated. The affair with Begley was not an official act, and though a disgraceful row, it does not appear that he neglected any official duty by reason of it. The dispersal of the crowd in the pool room appears to have been done officially and the attack on the boy was unlawful. It might sustain a prosecution for malfeasance in office, which upon his conviction would automatically remove him from office, but for this he is entitled to a jury trial, it not being the character of neglect contemplated by the amendment.

Other evidence was introduced as to matters not embraced in any of the charges and it is unnecessary to consider it.

We have carefully examined the entire record and it may be said that if all the evidence and charges related

to matters occurring after the effective date of the act, and the charges were supported by sufficient affidavits, there would be ground for a number of the findings made by the Governor, and the executive order of removal might be affirmed by this court, but, for the reasons above stated, such of the charges and evidence as can be considered are insufficient to sustain either. It is, therefore, ordered that the executive order entered by Governor William J. Fields on the 5th of March, 1925, removing appellant from office of sheriff of Perry county and ad judging him to pay the costs of the proceeding, be and the same is cancelled and set aside and that the charges herein be, and they are, now dismissed.

Whole court sitting.

Judges Dietzman and Clarke dissenting.

DISSENTING OPINION BY CHIEF JUSTICE CLARKE.

By the terms of section 227 of the Constitution prior to its amendment in 1919, the office of any county officer automatically became vacant upon his conviction by indictment or prosecution "for misfeasance or malfeasance in office or willful neglect in discharge of official duties." Earlier constitutions contained the same provision but it has proven of little practical value in securing a rigid observance of law as was its evident purpose. Unquestionably this was due in part, as is pointed out in the court's opinion, to the difficulty, which amounts almost to an impossibility, of convicting or even indicting officials in their home county of delinquency in office no matter how flagrant or detrimental to public welfare.

In my judgment another efficient cause for the lamentable failure of this constitutional provision to secure a better service from county officials is to be found in the fact that this court, in the few cases that came to it involving the section, construed it so narrowly as to exclude from its provisions all misconduct upon the part of an officer while in office but not actually engaged in the performance of some duty specifically enjoined upon him.

The latest of these cases, Commonwealth v. Williams, 79 Ky. 42, was decided in 1880, and, upon authority of Commonwealth v. Barry, Hardin 238, and Commonwealth v. Chambers, 1 J. J. Marshall 160, holds that a county judge who was drunk in his office during office hours and while performing official duties, was drunk "individually" and not "officially" and that therefore an act of

the legislature authorizing his removal therefor under section 227 of the Constitution was itself violative of that section.

The court's opinion herein concedes, as was inevitable, that the purpose of the legislature in proposing and the people in adopting the recent amendment to this section of the Constitution, was to secure, upon the part of county peace officers, better enforcement of *some* of the laws of the state.

It is the contention of the Commonwealth, as it is of Judge Dietzman and myself, that the purpose of this amendment was to secure better observance of *all* of the laws of the state.   Stated otherwise and more concretely, the court's position is that the only purpose of the amendment was to make peace officers diligent in enforcing the law against others than themselves, while our view is that its purpose was to secure observance of the law by the officials themselves as well as by the citizens of the state.   This difference of opinion as to the purpose of the amendment, as well as how narrowly it has been construed by the court, is best illustrated by the court's refusal to apply same to appellant's conduct upon the night of January 30, 1925, and which I need not again detail here, since it is fully set out in the court's opinion. That his conduct was most reprehensible and "may be denominated as gross misconduct," is admitted by the majority opinion which, nevertheless, holds that he cannot be removed from office therefor, because, though drunk and acting wrongfully in the performance of an official duty in the pool room, he was acting diligently and, after leaving the pool room, he was not acting officially but individually in trying to run a city peace officer away from his post of duty and putting him in such fear as to prevent him from arresting and lodging appellant in jail, as was clearly his duty, if as the court held, appellant was not then acting officially but only individually.   That such a conclusion must have been rested upon extreme technicalities rather than upon a common understanding of appellant's duties to the public as chief peace officer of the county is not only self-evident but also confirmed by an examination of the court's opinion.

The opinion upon final analysis will be found to be based upon the assumption that the legislature in proposing and the people in adopting the amendment intended to perpetuate rather than to terminate the technical distinctions which led this court forty-five years ago

in Commonwealth v. Williams, *supra,* to hold that a county judge who was drunk in his office during office hours and while engaged in the performance of official duty, was acting individually and not officially.

Just the reverse seems to me to be true even if, as the court holds, we must assume that in proposing and adopting the amendment the legislature and the people of the state had these old opinions in mind. This is, I think, fully demonstrated by the well known and marked difference in public opinion with reference to law enforcement and official duty that has taken place in the past forty-five years; but, more especially by the fact that the legislature in proposing the amendment carefully avoided use of any of the technical terms employed in the old section in describing causes for removal and provided simply that any peace officer could be removed for any "neglect of duty." It will be noticed the amendment does not even say "neglect of official duty," which in my judgment, is most significant and of itself sufficient to render inapplicable the technical distinctions between the official and individual acts of a peace officer recognized in the case of Commonwealth v. Williams, su*pra.* Certainly if the legislature that proposed the amendment and the people who voted for it knew of these ancient opinions of the court, based upon outworn and discarded conceptions of the duty an official owes to the public, and desired to perpetuate rather than terminate them, they would at least have used the words "neglect of *official* duty" rather than simply "neglect of duty" as they did, Besides, even if this were not true, I confidently assert that it is the duty of this court to take judicial knowledge of the fact that public opinion has changed wonderfully and for the better in the past forty-five years as to the duties of not only public officials but of good citizens as well with reference to law enforcement. It therefore necessarily follows that the fact, if a fact, a public official was not guilty of neglect of official duty in 1880 by being drunk in his office during office hours and while actually engaged in the performance of official duty, has no place whatever in a consideration of the public opinion which in 1919 induced the legislature to propose and the people to adopt a change of policy toward such officials. I also feel warranted in saying that it is a matter of common knowledge that the public opinion upon the question has undergone such a change as to amount to a revulsion against the old and lax view of the matter. To my way

of thinking, and I say it with all due respect not only to my associates who have the other view, but to the members of the court which rendered the opinion in 1880 in Commonwealth v. Williams, that that opinion exploits a legal technicality at the expense of common sense and, that it is little less than monstrous to make it and its century old predecessors of like import the basis of emasculating a present day amendment to the Constitution and invalidating in large measure the act of the legislature attempting to make effective that amendment. Whatever may have been the judicial view in 1880 and prior thereto about the duties of peace officers, I feel sure most if not all citizens who in 1919 voted either for or against the amendment, did so with the firm belief that it was the official duty of a peace officer, in consonance with his oath of office, to observe the law himself as well as to enforce its obedience upon others. Indeed it seems axiomatic to me that such must always have been the conception of good citizens everywhere, and I cannot believe that now or at any time since the foundation of this Commonwealth a contrary declaration was justified by enlightened public opinion, good morals, sound judgment or even the technicalities of the law.

Law enforcement like charity ought to begin at home. That an official who does not himself observe not only some law but all the law can efficiently enforce its observance upon others, is not now and never could have been anything more than a fiction of law. Assuming if we must such a fiction was required prior to the adoption of the amendment by the technical language employed in section 227 of the Constitution in defining the offenses for which a county officer forfeited his office upon conviction in a court of justice, the absense of any such technicality in the present amendment and particularly the employment of "neglect of duty" rather than "neglect of official duty" is, in my judgment, not only sufficient ground for assuming the legislature that proposed and the people that adopted the amendment intended to disregard all technicalities with reference to misfeasance, malfeasance or nonfeasance as well as neglect of "official" duty in which the original section had become enmeshed, but sufficient also to make it the mandatory duty of this court so to do in construing the amendment. Any other view seems to me to disregard not only the plain, simple and all inclusive terms of the amendment but also to exclude any consideration whatever of present day conceptions

of the duty of public officials upon the present day vital question of law enforcement,

Then again, the legislature that enacted the law to make effective the amendment, had the other and broader view that it meant any neglect of duty, whether technically it amounted to misfeasance, malfeasance or neglect in discharge of official duties. The effect of the adopted construction is to render invalid much if not the greater part of the act. This of course is immaterial if the legislature *clearly* misconstrued its powers under the amendment, but only so, for if there is reasonable doubt about the matter, then, under another familiar rule of construction, the act just as clearly should be upheld. That the court's construction is at least of doubtful propriety I think its consequences as well as the language of the amendment clearly demonstrates. Under that construction the legislature is empowered simply to provide for the removal of county peace officers who fail to act diligently in protecting a prisoner, arresting a criminal for a crime committed in their presence or serving subpoena, but left powerless to provide for their removal without proof of an overt act of nonfeasance no matter how wrongfully or outrageously they perform any such duty, or even if they flagrantly and habitually conduct themselves while in office in such way to render them illy prepared when called upon to perform an "official" duty. The opinion itself admits there is much force in the other view but rejects it upon technical grounds that I am sure few if any of the members of the legislature that proposed the amendment or the people who voted for it had in mind, or ever heard or could have comprehended.

If what I have already said is true, as I believe it to be, it is hardly necessary to cite authorities to show this court has erred in giving to the phrase "neglect of duty" a technical rather than its ordinary and commonly understood meaning, so I shall refer and but briefly to only a few of the many and, so far as I can find, harmonious authorities on the subject. In Cooley on Constitutional Limitations, page 89, the object in construing a constitutional provision is stated to be, as even without this eminent authority it obviously ought to be, "to give effect to the intent of the people in adopting it." The same rule is thus expressed in 6 R. C. L., page 52:

> "Words or terms used in a constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common

understanding *at the time of its adoption,* although a different rule might be applied in interpreting statutes and acts of the legislature.'' (My italics).

In Penitentiary Commissioners v. Spencer, 159 Ky. 258, the court said: ''The Constitution is not a technical instrument and should not be so construed as to defeat the substantial purposes of its adoption.'' Again, in Samuels v. Clinton, 184 Ky. 104, the court said that the Constitution ''adopted by a popular expression of the people at large, its terms should be given a meaning in accordance with their usual and customary significance.'' Again, in Gatton v. Fiscal Court of Daviess County, 169 Ky. 425, 184 S. W. 1, it was held that an amendment to the Constitution is not regarded as if it had been a part of the original instrument, but is considered in the nature of a codicil altering the original to the extent to which it is in conflict with it.

I therefore dissent from the court's construction of the amendment with its consequent impairment of the legislative act adopted to make it effective and from its rescission of the Governor's order removing appellant from office in so far as same is based upon his conduct on the night of January 30, 1925.

Judge Dietzman authorizes me to state that he concurs in these views.