## Sanders v. Commonwealth.

(Decided April 25, 1933.)

226

J. L. VALLANDINGHAM and ROGERS & ROGERS for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for apepllee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Bob Sanders, jailer of Owen county, Ky., was indicted and convicted of the offense of willful neglect in the discharge of his official duties as jailer. He was fined $100 and his office adjudged vacant. He appeals.

The indictment charges that "the said Bob Sanders, in the state and county aforesaid, on the 19th day of September, 1931, and within twelve months before the finding of this indictment, while he, the said Bob Sanders, was acting jailer of Owen county, Kentucky, after having been duly elected and qualified as such, did unlawfully, willfully, knowingly neglect to discharge the duties of his office as jailer of Owen county, Kentucky, by being drunk and in an intoxicated condition, by absenting himself from the said jail and the court house of Owen county, Kentucky, without leaving in charge of said jail, a deputy jailer to discharge the duties of the jailer's office; that on the said 19th day of September, 1931, a court of inquiry was being held in Owenton, Kentucky, the county seat of Owen county, by Judge Howard Ellis, the duly elected and qualified and acting county judge of Owen county, Kentucky, investigating law violations in Owen county, Kentucky; that said Howard Ellis, judge of said court, desired the presence of ———— Bradley, Earl Braden and John Wells before said court of inquiry, to be sworn and to give evidence concerning certain law violations in Owen

county, Kentucky; said ———— Bradley, Earl Braden, and John Wells, then being confined in said jail charged with violations of the criminal laws of Kentucky, they being in custody of said Bob Sanders and locked in said jail; that it was the duty of said Bob Sanders, jailer, to be at the jail or at the court house in Owen county, Kentucky, during said court of inquiry and at all times, or to have in his stead a deputy jailer to discharge the duties of the jailer's office and thereby bring said —— Bradley, Earl Braden and John Wells out of said jail to testify before said court of inquiry when their presence was desired before said court, but the said Bob Sanders, jailer, on the 19th day of September, 1931, and while said court of inquiry was in session, did unlawfully, willfully, knowingly neglect to discharge the duties of said office as jailer of Owen county, Kentucky, by being drunk and in an intoxicated condition and by leaving the jail and failing and neglecting to discharge the duties of his office and without leaving in charge of the jail a deputy jailer to discharge the duties of the jailer's office.''

In the second count or item, the indictment charges a similar act committed on the 7th day of October, 1931, the accusative and descriptive parts being the same in substance as the first, except that it charges that on said date the defendant absented himself from the jail and county, by going to Carrollton, Carroll county, Ky., and there remaining drunk and in an intoxicated condition, and thereby neglected his duties as jailer, in the same way and manner in substance as set out in count 1. The third count or item charges that on the 8th day of October, 1931, the defendant committed a similar act which is, in substance, a repetition of count or item 2; the only difference being in the dates. It further charges that on the 9th day of October, 1931, defendant committed similar acts as set out in the above counts, except that it charges that he absented himself by going to Monterey in Owen county; the accusative and descriptive parts being, in substance, the same as the other items. It further charges that on the 31st day of October, 1931, the defendant unlawfully, willfully, and knowingly neglected to discharge the duties of his office by permitting a person to go into the said jail without being guarded or searched, conveying into the jail and delivering to certain prisoners therein hacksaw blade,

for the purpose of aiding and assisting them to escape therefrom.

A demurrer to the indictment and a motion to elect were overruled, both of which the appellant complains.

It is insisted that the indictment charged more than one offense, and for that reason the demurrer should have been sustained, or the motion to elect sustained. We are unable to find any merit in that contention. The indictment charges the offense of willful neglect in the discharge of his official duties. The fact that the indictment charges. that the offense was committed in various ways, modes, and times does not mean that it charges more than one offense. A single or isolated act might not constitute the offense charged, but rather a continuation, repetition, and habitual indulgence in the conduct charged is the gravamen of the offense. The different items or counts set out in the indictment are merely conducive to show the different means, modes, and manner by which he committed the offense of willful neglect of his official duties. The fact that the indictment set out in detail the various dates and conduct showing when and how the alleged offense was committed was favorable to the defendant, in that it fully apprised him of the nature of the charges and he was thereby enabled to meet the issues. There is but one offense charged, to wit, ''willful neglect in the discharge of his official duties,'' and the different dates and items set out in the indictment are combined to constitute that single charge. The trial court did not err in overruling the demurrer and motion to elect. Section 126, Criminal Code of Practice; Curd v. Commonwealth, 210 Ky. 588, 276 S. W. 498; Hannah v. Commonwealth, 242 Ky. 220, 46 S. W. (2d) 121; Greenbaum v. Commonwealth, 10 Ky. Law Rep. 723; Robbins v. Commonwealth, 232 Ky. 115, 22 S. W. (2d) 440; Castle v. Commonwealth, 232 Ky. 561, 24 S. W. (2d) 298; Fuson v. Commonwealth, 241 Ky. 481, 44 S. W. (2d) 578.

Appellant, in support of his contentions relating to the indictment and evidence, relies solely upon the case of Holliday v. Fields, Gov., 210 Ky. 179, 275 S. W. 642. The case supra is not analogous to the case at bar. That was a proceeding pursuant to section 227 of the State Constitution, and the provisions of chapter 49 of the Acts of the General Assembly of 1924, whereas the instant case is a proceeding under indictment of the grand jury pursuant to section 3748, Kentucky Statutes.

The Holliday Case turned upon many features not analogous to the instant case. It is not necessary to extend this opinion by an elaboration upon the case supra. A reading of the case will disclose that it is not applicable to the instant case.

It is stipulated and agreed that the defendant, Bob Sanders, is and was at all times mentioned in the indictment the duly elected and acting jailer of Owen county, Ky. This dispenses with the necessity of proving that he was such officer.

Appellant in his brief insists that the court erred in admitting evidence relating to appellant's intoxication and conduct other than merely being absent from the jail. This requires a resume of the evidence.

Howard Ellis, county judge of Owen county, testified, in substance: That on the 19th day of September, 1931, he held a court of inquiry at the office of the county attorney at Owenton for the purpose of investigating certain law violations in the county, and that Earl Braden and John Wells were at that time under observance or suspects, and were in the county jail. That the defendant jailer was not present at the jail nor about the courthouse, and he instructed a deputy sheriff to notify the jailer and have him (the jailer) to bring the men out of jail, but the deputy sheriff could not find Sanders, but finally the deputy sheriff procured the prisoners and brought them into court. That the sheriff had to perform this duty because of the absence of the jailer, who could not be found. That he did not see the jailer until about 2 o'clock in the afternoon, at which time he appeared in the county judge's office and raised a disturbance with the deputy sheriff. That he was cursing, using profane, loud, and boisterous language, saying that he was running the jail and it was no business of his (the sheriff) and he did not want him over there, that, when prisoners were to be brought forth, he would bring them, and that he did not need any help. He stated: That Sanders, the jailer, appeared to be drunk, and that he smelled whisky on him. That he (county judge) tried to reason with Sanders, and told him that he had instructed the sheriff to bring the men from the jail, and Sanders proceeded then to "bawl me out," and said that I was aiming to run his business and everybody else's and that he was not going to stand for it. He cursed and used abusive language,.

and his conduct was such that he instructed the deputy sheriff to take him to jail and lock him up. They started to jail with him, and he resisted and drew a pistol. That he was intoxicated and seemed to be wanting trouble. That, after they took the pistol from him, he was marching up and down the courthouse yard and talking. That he saw him again later in the day, and that he was still mad and under the influence of liquor and trying to raise a disturbance with him (county judge). That at this time Sanders had no deputy jailer or other person officially in charge of the jail. He further testified: Upon the 7th day of October, 1931, while the prisoners were still in jail, that Sanders was absent from Owenton, the county seat, and at that time had no acting qualified deputy jailer. That he was absent on the 8th and 9th days of October without leaving any deputy jailer or other person in charge of the jail. That on the night of the 9th of October, after he (Judge Ellis) had retired for the night, he was awakened by some one trying to break down the door. He got up and went down stairs and Sanders was standing on the porch only partly clad; had no hat, no coat, one shoe, collar undone, shirt undone down front, and seemed to be excited. He was mumbling something inaudibly, and he finally understood that he wanted to be taken to the doctor, and that in his opinion he was very drunk, and that he smelled whisky on him. Sanders said that he had been shot, and asked him to take him to a doctor. That he took him in his car and took him to the doctor, and he had been shot in the left leg. He offered to take him home and he said that he was not going home, that he would not have his wife see him in that condition for a thousand dollars. That he (Judge Ellis) made some reference to Sanders' intoxicated condition, and Sanders flew into a rage and dared judge to take him home and cursed and said that he could get home. He then started in the direction of his home. In about 30 minutes Judge Ellis again received information that he was wanted to take care of Mr. Sanders and learned that Mr. Sanders was in company of the sheriff at a place in Owenton known as Dog Hill. Judge Ellis found him on the porch of Florean Meeks. He was creating a disturbance and cursing and using loud language and threatening to kill somebody. Mr. Giles and Mr. Davis, who were trying to take care of Sanders, succeeded in getting him off the porch, and he drew

a pistol and fired into the air. Judge Ellis told the sheriff to take him and lock him up in his jail. That there was no deputy jailer or other authorized person in charge ot the jail at that time.

T. N. Howell, marshall of Owenton, testified: That on about October 9, 1931, he saw Sanders in Owenton at Dog Hill on the porch referred to by Judge Ellis. That Sanders was drunk and talking in loud voice; had one shoe off. That Sanders pulled his pistol, threw it up in the air, and said that he was the "best damn man in Owenton." Judge Ellis was present and ordered them to take the pistol from him, which they did, and they brought him to the jail.

Walter Wilhoite, county court clerk of Owen county, was introduced with the county court records, which disclosed that Sanders had his son, Arthur Sanders, appointed deputy jailer on October 16, 1931. It is conceded that no deputy jailer had been appointed previous to this date.

Alzie Kraughsill stated: That he lived in Owenton at the place called Dog Hill, referred to by other witnesses, and that Sanders came to his door at the time referred to by the other witnesses, and knocked on his door and said he wanted to get his shoe. That he had only one shoe on. That he told him that he had no shoe there, and he said, "G— d— it, you have got my shoe in here and I know it." That Sanders was drunk and persisted in knocking on the door and threatened to break it down and continued to disobey his orders to leave the door, and finally he (the witness) shot through the door, which struck Sanders' leg. That before he shot he told him that, if he broke the door open, he would leave him laying there, and Sanders said "that I was too G— d— big coward to shoot, and dared me to shoot."

Witness Mr. Giles, sheriff of Owen county, testified that he was called to Dog Hill on the night of October 9, and that in response to the call he proceeded to go to Dog Hill, and found Sanders on Babe Meek's porch, drunk, beating on the door and talking, swearing, and using rough language, and had one shoe off. He further testified to about the same state of facts as stated by other witnesses relating to his conduct on that night. The sheriff further testified that about this time, being

unable to fix the exact date, he was called by Suter Craigmyle to come and get Sanders, and that he went down there and found Sanders, and he was drinking some. Witness James Gayle, sheriff of Carroll county, testified: That about this time, night of October 9, 1931, he saw Sanders at Carrollton. That he received information by telephone call that some one had run into a buggy on the Ghent road, and that, while on his way to Ghent road, he saw a car turn toward Owenton, and, on overtaking the car, he found Sanders and some young fellow, who was driving, in the car. That the young man, the driver, was sober, but Mr. Sanders was drunk, and told him the sheriff that if he wanted to arrest him to take him back to Carrollton and he would make June sign his bond. No arrest was made, and Sanders came back to Owenton. He stated that there was a pistol and a half-pint bottle of whisky on the floor of the car.

Sanders, appellant, denied that he ever left the jail without leaving somebody in charge, that he always left the keys in charge of his wife and the town marshal, and other friends volunteered their services to attend to the jail in his absence. In this he is corroborated by other witnesses. He did not deny being absent at any time referred to in the indictment and in the testimony of the commonwealth witnesses. He does not claim to have had any regularly appointed deputy jailer until his son was appointed on October 16, 1931, which was subsequent to the acts complained of on September 19, and October 7, 8, and 9. He denied that he was intoxicated at the time he had the controversy with Judge Ellis. He admitted that he became infuriated and mad because the county judge had had the prisoners brought out in his absence, but denied that he was intoxicated. When asked if he was drunk on the night of October 9, during the incident on Dog Hill, he said, "Some witnesses said I was, and others said I was partly," and finally said that he was not drunk, but admitted that he had drunk some home brew.

Arthur Sanders, son of the jailer, testified that his father left him in charge of the jail during the absence of his father and that he was in charge of the jail on the night of the controversy on Dog Hill, that his father was not absent more than an average of two days out of the month, and that he was always in charge of the

jail, but he admitted that he was not present on September 19, at the time the court of inquiry was held and the prisoners wanted from the jail, that he did not know where his father was nor what his condition was. When asked about what took place at the time his father was absent on the day he went to Monterey, he said he did not know what took place that night, and, when asked about his father's condition, he said: "He didn't look right, that he looked mad." When asked if he was drunk he said: "No, he wasn't staggering." When asked that, if he was acting jailer, why did Howell and others have to feed the prisoners, he answered, "I wasn't at the jail," and that he was going to Carrollton with his father. It is apparent from the testimony of this witness on cross-examination that he gave very little attention to the jail.

It is insisted that the testimony of the commonwealth witnesses relating to the controversy on Dog Hill and defendant's intoxicated condition was incompetent.

As relating to the incident on Dog Hill, the court admonished the jury that all testimony with reference to what took place at Dog Hill was excluded from the jury and that they consider this testimony only so far as it shows the condition Mr. Sanders was in at that time. We think the testimony was competent for the purpose of showing the appellant's condition with reference to being drunk or sober. It is true the court did not admonish the jury as to the nature of all this testimony at the time it was given by the witnesses, but the admonition given the jury relating to the incident on Dog Hill applies to other evidence of like import. If there was any technical error in the admittance of this testimony by not properly admonishing the jury at the time, we think it was cured by the instructions. Instruction No. 4 reads:

> "The jury can not convict the defendant for drunkenness and disorderly conduct, or either, if any, and if any, it may be considered by you for the purpose only of determining whether or not such conduct, if any, contributed to or caused defendant to willfully neglect his duties as jailer, if he did neglect his duties as jailer."

The word "willfully" means intentionally, not accidental. It is common knowledge that men drink

whisky intentionally, and that whisky makes men drunk. It is equally well known that a drunk man is incompetent to perform official duties.

It is insisted that the evidence is insufficient to convict the defendant of the offense charged in the indictment and that the jury convicted him for being drunk and disorderly. In view of the admonition of the court and instructions above quoted, we are unable to conceive that the jury convicted appellant for any offense other than the one charged in the indictment. Conceding that there may have been some technical error in the production of the testimony, but in view of the overwhelming competent testimony produced for the commonwealth, we do not think that such minor errors, if any, would have changed the results. Errors not prejudicial to the substantial rights of a party will be disregarded. Section 338, Civil Code of Practice.

Perceiving no error prejudicial to the substantial rights of appellant, the judgment is affirmed.